### BLOSSOM *v.* RAILROAD COMPANY.

1. A bidder at a judicial sale at public auction, whose bid has not been ac cepted,—the sale being adjourned for sufficient cause and finally dis continued—cannot insist, even though he have been the highest and best bidder, on leave to pay the amount of his bid, and have a confir- mation of the sale to *him.*

2. The marshal, or other officer, who makes a sale of real property under a decree of foreclosure, possesses the power, for good cause shown, in the exercise of a sound discretion, and in subordination to the superior control of the court over the whole matter of the sale, to adjourn the sale from time to time.

3. In a case where the decree was that the sale should be made *unless the mortgagors should previously pay the mortgage debt,* a few short adjourn- ments for the purpose of enabling the mortgagors to make an arrange- ment to pay it, are adjournments for sufficient cause, although such adjournments have been made by *direction* of the complainant's so- licitor. And if, prior to the day to which the sale stands adjourned, the mortgagors come in and pay the complainants the amount of the decree, &c., the sale may properly be discontinued altogether.

THE Milwaukee and Chicago Railroad having mortgaged their railroad, and suit having been brought in the Federal court for Wisconsin, to foreclose the mortgage, a decree was obtained that the mortgaged premises should be sold at

*public auction*, under the direction of the marshal, *unless the mortgagors, previously to such sale, should pay to the complainants the sum of* $254,175—the amount of the decree. The marshal, accordingly, offered the premises for sale on the 6th of June, 1862, but no bids being received, he adjourned it "by direction of the complainant's solicitor," to the 19th of the same month, at the same hour and place. At the time and place of adjournment he put up the premises again, and one Blossom bid $250,000 for them; this being the highest and best bid received at that time. Fearing that the property would be sacrificed, if the sale should be completed, the agent of the stockholders applied to the *solicitors of the complainants*, requesting that the sale might be postponed for a short time to enable the respondents to make some arrangements to pay the amount of the decree without a sale of the property. *The solicitors gave such directions*, and the marshal again adjourned the sale; the adjournment being to the 21st June—two days—and the marshal giving notice that at the expiration of this time the sale would be opened at the same hour and place, and with the bid of $250,000 already made by Blossom. During these two days the mortgagors made arrangements to pay the mortgage, but had not been able by the 21st to have the money actually in hand. The sale, after being opened, and after Blossom had increased his bid to the full amount of the mortgage debt— but no other bids being received—was again adjourned by *direction of the complainant's solicitor;* this adjournment being to the 1st October, 1862, and being also the second adjournment made by direction of the solicitor aforesaid, after the bid of $250,000 had been made. On this 1st October the sale was again opened, and *by the same direction* further adjourned till the 15th January, 1863; this being, of course, the third adjournment made by the same direction, and after Blossom's bid. Previous to this 15th January, however, the company had paid the amount of the decree, and the marshal by order of the *complainant's solicitor* discontinued the sale altogether.

On the 9th October, 1862, Blossom, by petition to the

court below—sworn to and stating that "he made both bids in good faith, and has been ever since and now is ready to comply with his said bid, and hereby offers to bring that amount into court"—applied to have the sale confirmed to *him* on his bid as increased to the full amount of the decree of foreclosure and sale, but the court denied the petition, and he appealed here.

It having been lately decided in this court, on a motion to dismiss his appeal, that he was entitled to be heard here,* his case now came on upon its merits.

*Messrs. Cushing and Carpenter, for the appellant Blossom.*

I. *As to the effect of the bid:* When this case was here before, the court said: "A purchaser or a bidder at a master's sale in chancery subjects himself *quoad hoc* to the jurisdiction of the court, and can be compelled to perform his agreement specifically. It would seem that he must acquire a corresponding right to appear and claim at the hands of the court, such relief as the rules of equity proceedings entitle him to."

What then are the rights which a purchaser, a stranger to the suit, acquires, by making a *bonâ fide* bid, which he offers to give effect to by payment to the marshal?

In foreclosures under decree in chancery, the mortgagee asks the court to take to itself the mortgaged premises, and hold or dispose of them for his benefit. This the court does by ordering the property to be sold to raise the amount due. "A decree for a sale to effect a partition, or to pay debts, virtually," says one case,† "*takes possession of the estate and vests it in the court for the purpose of distribution.*" The rights of all parties are in fact merged in the decree of foreclosure, and possession is vested by the decree of sale in the court, for the purpose of enabling it to sell the property and give possession. In one New York case,‡ the chancellor says: "Both parties appear to have fallen into the *very common error* of supposing that the owner of the decree had the

---

* Blossom *v.* Railroad Co., 1 Wallace, 655.

† Williams's Case, 3 Bland, 215.

‡ Snyder *v.* Stafford, 11 Paige, 76.

right to control the action of the master, and to direct which parcel should first be sold;"—an error which the chancellor repels.   In another,* it was held, that the complainant in whose favor a decree had been rendered in a foreclosure case, could not control its execution to the prejudice of other parties interested; and that defendants might apply to the court to have the execution of the decree committed to them, if the complainant unreasonably neglected to proceed to a sale.   In a third,† Nelson, J., speaking of sales by the master in foreclosure causes, says: "I am aware that these officers usually follow the direction of the plaintiff, or his solicitor, in this respect, and their interest perhaps may lead them to do so, as they are usually selected by the parties, *but there is nothing in the nature of the office, or the duties belonging to it, which puts them under the control of the parties.*   The interposition of an officer to sell the property of defendants at auction would be a useless ceremony *if the officer was to be under the direction of the plaintiff.*   If the master is not only independent of the party, but bound to execute the functions of his office, I should like to know upon what principle the bid of a party or his solicitor can be at all sustained.   The party would be substantially both auctioneer and bidder."

In sales under decrees, according to the English practice, there is no such thing as striking off or knocking down the property.   The bids are received, and the best bid is reported to the court.   The form of a report is as follows:‡ "George Ansley attended the sale," &c., *and offered* to give for the purchase of, &c., "and no person having offered to give more for the said," &c., "*I do allow* the said George Ansley to be the best purchaser thereof," &c., &c.   In all the English cases the language is, "A. R. having been reported the best bidder or purchaser."

In *Blount* v. *Blount,*§ Lord Hardwicke, says: "Where estates for lives have dropped in between a person's being

---

* Kelly *v.* Israel, Id. 147.
† Collier *v.* Whipple, 13 Wendell, 224.
‡ Bennet's Master, 125.
§ 3 Atkyns, 637; and see Ex parte Manning, 2 Peere Williams, 410.

reported the *best* purchaser by the master, and his taking possession," &c.;—showing that the master does not pretend to strike off the property, but simply reports the facts to the court. It is the court then that enters into contract relations with strangers to the suit, whom it invites by its advertisement to become purchasers of the property; and it is of no consequence whether the marshal strike off the property or not. *He* cannot thereby complete the sale: it must be confirmed by the court. In sales on execution the officer completes the sale, and therefore it is the striking off of the property that evidences its consummation. But in a sale under decree, the officer need only report to the court who is the highest and best bidder.

In the New York case of *Brown* v. *Frost*,* it was asserted at the bar to be a rule of chancery that the right of redemption remains after the biddings until the sale was confirmed by the court. But the chancellor says: "If such a rule exists it is one which I never heard of before; and no such right has ever been claimed by the owner of mortgaged premises, in any suit or proceedings before me, during the fifteen years in which I have presided in this court. . . . *The former owner of the equity of redemption cannot prevent the completion of the sale, and the confirmation of the report, by tendering or offering to pay the amount of the decree, with interest and costs.*"

If Blossom had refused to perform his part of the contract, or had been unable to do so, the court might have ordered the property to be resold at his risk, holding him liable for any deficiency.† The bid compelled him to keep this large sum at command to meet it. Good faith and public policy require that he should be protected in the corresponding rights acquired by him as a purchaser.

II. *As to the adjournments.* Here are no less than four different adjournments—running over a term of seven months—for the mere purpose of enabling a delinquent debtor to

---

* 10 Paige, 246–7.

† Millikin *v.* Millikin, 1 Bland, 541; Harding *v.* Harding, 4 Mylne & Craig, 514; Gray *v.* Gray, 1 Bevan, 199.

redeem. Blossom, on the 19th June,—the day when the sale was adjourned for the second time,—having bid nearly the whole amount of the debt due, the large sum of $250,000. If this court shall hold that he acquired no rights by so doing; that the complainants had the right to control the marshal, and continue the sale from time to time, at their pleasure, until the purchaser should be ruined by keeping his money at command, what *bonâ fide* bidder will ever again incur the hazard and inequality of such a rule, by bidding for property hereafter offered for sale by a Federal court? Certainly the right claimed by the complainants would put every mortgaged railway corporation in the power of its mortgagors, and would enable them to acquire its property at their own price. For if they have the power to adjourn the sale three times, they may a hundred, and until every competent bidder is ruined, or consents to withdraw from the biddings. The complainants can then buy for what they will.

*Messrs. Cary, Buckley, and Brown, contra.*

I. *What was the effect of the bid?* By appearing at the sale and bidding for the property, Blossom simply made a proposition, which, if it had been *accepted,* would have bound him to its performance; but until it was accepted, and the sale was consummated by the property, on that bid, being struck off, he was not bound, and he was at liberty to withdraw his bid at any time he chose before such acceptance.

The American practice of judicial sales is to sell at auction, and in all cases the officer making the sale designates the purchaser by accepting his bid, and formally *striking off* the property to him, in presence of the spectators. In this case the order of the decree was express that the property should be sold at public auction, and the well-settled rule that a bidder may at any time retract, of course applies.

Again, the officer does in all cases report that he has *sold* the property, naming the person purchasing; also, stating the amount for which the sale was made, and that it was the highest and best bid. It is true that all such sales are within

the power of the court, either to confirm or to set aside. But the court never confirms or sets aside a sale until it has been made and reported by its officer; and probably the case at bar is the first instance of an attempt in this country to have an unaccepted bid, at a judicial sale, declared a valid and binding sale, and confirmed as such. Under our practice, there is no difference whether the sale is on execution or under a decree, so far as striking off the property to the highest bidder is concerned, in order to consummate a sale.

We are aware that the English practice is somewhat different; but their practice, in this respect, is not in force in this country. If, however, the practice of the English courts of chancery is to govern, then no bid was ever made. In England, the officer has a book in which each person writes out his proposition and signs it. No other form of bids is considered; here there was no written offer, and no memorandum made by the marshal or signed by them. And even after the biddings are closed and the purchase-money paid, the bidder in England acquired no interest in the land until after confirmation. And if the premises are destroyed by fire, the bidder is not bound by his bid.*

II. *As to the adjournments.* The decree itself gives the defendant the right to pay off the mortgage at any time before the sale; not before the *day* of sale, or the *hour* of sale, or before the first bid, but before the sale itself. But when has a sale taken place? It is when the biddings are completed as required by the rules and practice of the court; when the marshal has ascertained by actual experiment (crying the property, and awaiting a reasonable time) that higher bids than those already made cannot be obtained; and has by public declaration so determined, that the sale has taken place.

That a defendant cannot, at any time before a sale of his property is consummated, prevent such a sale by the payment of the judgment or decree, *to satisfy which alone the sale is made*, is a doctrine not to be entertained. The object of

---

* Ex parte Minor, 11 Vesey, 559; Turgg v. Fifield, 13 Id. 517.

courts of chancery is not to punish the mortgagor or sell his property, but to protect the ultimate rights of the mortgagee. It will, therefore, allow the defendant every indulgence consistent with those rights. Even at law the officer is bound to protect the property against sacrifice, and may postpone the sale in the exercise of a sound discretion, after bids.*

The case does not at all show that Blossom was compelled, as argued on the other side, to keep a large sum of money on hand to meet his bid, or that he ever could have raised it. He made no tender of money, and this alone would be conclusive against him.

Mr. Justice CLIFFORD delivered the opinion of the court.

Respondents mortgaged their railroad to certain trustees as a security for moneys loaned and advances of various kinds, and to defray the current expenses of operating the railroad and of keeping the same in repair. Suit was brought by the trustees and certain creditors, named in the bill of complaint, to foreclose the mortgage for a breach of the conditions, and the cause proceeded to a decree of foreclosure and of sale. Substance of the decree was that the mortgaged premises should be sold at public auction, under the direction of the marshal of the district, unless the mortgagors should pay to the complainants, previous to the sale, the sum of two hundred and fifty-four thousand one hundred and seventy-five dollars, with interest from the date of the decree. Pursuant to that decree, the marshal, on the 6th day of June, 1862, offered the mortgaged premises for sale, but as no bids were received he adjourned the sale, under the instructions of the solicitors of the complainants, to the 19th day of the same month, at the same hour and place.

Report of the marshal also shows that he again offered the premises for sale at the time and place of adjournment, and that the appellant bid for the same the sum of two hundred and fifty thousand dollars, which was the highest and best

---

* Tinkham v. Purdy, 5 Johnson, 345; Leader v. Denney, 1 Bosanquet & Puller, 359.

bid received at that time.   Fearing that the stock would be sacrificed if the sale should be completed, the agent of the stockholders made application to the solicitors of the complainants, requesting that the sale might be postponed for a short time, to enable the respondents to make some arrangements to pay the mortgage debt without a sale of the property.   Yielding to that suggestion the solicitors gave such directions, and the marshal accordingly adjourned the sale for the period of two days, giving notice at the time that the sale at the expiration of that period would be again opened at the same hour and place, and that the bid of the appellant would be regarded as pending.

Such an arrangement having been negotiated during those two days, a further adjournment became necessary to enable the parties to carry it into effect; but when the sale was opened for that purpose the appellant was present and increased his bid to the full amount of the mortgage debt, including interest, costs, and expenses of sale.   No other bids having been made the sale was adjourned, as directed, to the 1st day of October, and afterwards to the 15th day of January following, but before the day to which the last adjournment was made the respondents paid the amount of the decree to the complainants, and the sale was discontinued.

Record also shows that the appellant applied to the court by petition on the 9th day of October, 1862, to have the sale confirmed to him on his bid as increased to the full amount of the decree of foreclosure and sale, but the court denied the prayer of the petition, and from that order the petitioner appealed to this court.

1. Appellant contends that inasmuch as he bid the full amount of the decree, interest, and costs, at a time when the mortgaged premises were duly offered for sale, and inasmuch as his bid was the highest and best bid offered for the premises, it became and was the duty of the marshal to have struck off the property to him as the legal purchaser of the same, and that the District Court erred in denying his petition for the confirmation of the sale.   On the other hand, the respon-

dents deny that any sale was ever made, and insist that the bid of the appellant was a mere offer of purchase, which he might withdraw at any time before the bid was accepted or the property was struck off to him, and an entry to that effect was made by the marshal.

2. Sales of mortgaged premises under a decree of foreclosure and sale are usually made in the Federal courts by the marshal of the district where the decree was entered, or by the master appointed by the court, as directed in the decree. Such sales must be made by the person designated in the decree, or under his immediate direction and supervision, but he may employ an auctioneer to conduct the sale if it be made in his presence. Express directions of the decree in this case were that the mortgaged premises should be sold at public auction, unless the respondents, as mortgagors, should, previously to such sale, pay to the complainants the amount of the mortgage debt, as specified in the decree.

3. Contracts for the purchase and sale of goods or lands at public auction are contracts founded upon mutual promises and a mutuality of obligation, and consequently they cannot be regarded as having been perfected and made binding unless they have received the consent of the parties. Consent of parties being essential to the contract set up in this case, it becomes important to ascertain in what way and to what extent such assent must be manifested, and to distinguish accurately between mere offers or proposals by the one party not accepted or approved by the other, and mutual and positive engagements which neither party can retract or withdraw.*

Unaccepted offers to enter into a contract bind neither party, and can give rise to no cause of action; as, for example, if one merchant offer to sell goods to another, such an offer is not binding until it has been in some form accepted by the party to whom it was made. Liability cannot arise in such a case, because the party making the offer can-

---

* Addison on Contracts (ed. 1857), 23-154.

not be held answerable to the other for not selling the goods, unless that other by accepting the offer has bound himself to purchase.

4. Biddings at an auction, says Mr. Addison, are mere offers, which may be retracted at any time before the hammer is down and the offer has been accepted.* Leading case upon that subject is that of *Paine* v. *Cave*,† where it was expressly held that every bidding at an auction is nothing more than an offer on one side until it has received the assent of the auctioneer as the agent of the owner. Supreme Court of Pennsylvania held, in the case of *Fisher* v. *Leitzer*,‡ that a bidder at a sheriff's sale has a right to retract his bid before the property is struck down to him, and that the sheriff has no right to prescribe conditions which will deprive him of such a right. Express ruling was that a bid at an auction before the hammer falls is like an offer before acceptance, and that when the bid is withdrawn before it is accepted there is no contract, and that such a bidder cannot be regarded in any sense as a purchaser. Rule, as laid down in the last edition of "Story on Sales," is substantially the same as that adopted in the preceding case. Speaking of ordinary sales at an auction, the author says that the seller may withdraw the goods or the bidder may retract his bid at any time before they are struck off, and the reason assigned for the rule is, that so long as the final consent of both parties is not signified by the blow of the hammer there is no mutual agreement to a definite proposition.§ But as soon as the hammer is struck down, says the same author, the bargain is considered as concluded, and the seller has no right afterwards to accept a higher bid nor the buyer to withdraw from the contract.‖ Same rules prevail upon a sale under common law process as in other cases of sales at

---

\* Addison on Contracts (ed. 1857), 26.          † 3 Term, 148.

‡ 23 Pennsylvania State, 308.

§ 1 Sugden on Vendors and Purchasers, 25.

‖ Rutlidge *v.* Grant, 4 Bingham, 653; Cook *v.* Oxley, 3 Term, 654; Adams *v.* Linsdell, 1 Barnewall & Alderson, 681; Story on Sales, § 461.

public auction, so far as respects the question now before the court. Until the property is actually struck off to the bidder he may withdraw his bid as a mere offer or proposition.*

5. Judicial sales made under the decretal orders of courts of chancery, are also, in this country, governed substantially by the same rules, except that such sales are usually made by the marshal, or a master in chancery acting as an officer of the court, and are always regarded as under the control of the court, and subject to the power of the court to set the sale aside for good cause shown, or open it any time before it has been confirmed, if the circumstances of the case require the exercise of that power. Doubtless such sales are usually conducted under the advice of the solicitor of the complainant, and it is sometimes said that the solicitor, in all questions arising between the vendor and purchaser, must be considered as the agent of all the parties to the suit; but it is believed that the remark must be received with some qualification.† Suppose it to be so, however, in a qualified sense; still it is true that the marshal or master, as the case may be, is the officer of the court, and that as such his acts and proceedings are subject to the revision and control of the court.‡ In sales directed by a court of chancery, says Judge Story, the whole business is transacted by a public officer, under the guidance and superintendence of the court itself. Even after the sale is made, it is not final until a report is made to the court and it is approved and confirmed. Either party may object to the report, and the purchaser himself, who becomes a party to the sale, may appear before the court, and, if any mistake has occurred, may have it corrected. He, therefore, becomes a party to the proceeding, and may represent and defend his own interest, and may be compelled by process of the court to comply with the terms of the contract.§

---

* Crocker on Sheriffs, 201.
† Dalby *v.* Pullen, 1 Russel & Mylne, 296.
‡ Collier *v.* Whipple, 13 Wendell, 229.
§ Smith *v.* Arnold, 5 Mason, 420.

6. Subject to those qualifications, and perhaps some others which need not be noticed, the question of sale or no sale, when it arises under a state of facts such as are exhibited in this record, may be fully tested by substantially the same rules as those which apply in cases of sales under common law process, or in other cases of sales at public auction. Tested by those rules, it is clear to a demonstration that there was no sale of the mortgaged premises in this case, because the property was never struck off to the appellant, nor was his bid, by act or word or in any manner, ever accepted by the seller, and the record shows that, at the hearing in the court below, nothing of the kind was pretended by the appellant. Instead of setting up that pretence, his complaint was that the marshal erred in refusing to accept his bid, which, if possible, is less defensible upon the facts and circumstances of the case than the theory of the sale and purchase.

·7. Officers appointed under such decrees, and directed to make such sales, have the power to accomplish the object; but they are usually invested with a reasonable discretion as to the manner of its exercise, which they are not at liberty to overlook or disregard. Acting under the decree, they have duties to perform to the complainant, to the vendor and purchaser, and to the court, and they are bound to exercise their best judgment in the performance of all those duties. Such an officer, in acting under such a decree, if directed to sell the property, should adopt all necessary and proper means to fulfil the directions; but he should, at the same time, never lose sight of the fact that, unless he is restricted by the terms of the decree, the time and manner of effecting the sale are, in the first instance, vested in his sound discretion. Usual practice undoubtedly is, that the officer in selling the property acts under the advice of the solicitor of the complainant; but it cannot be admitted that his advice is, under all circumstances, obligatory upon the officer.

Granting that solicitors may properly advise the officer, still it must be borne in mind that the authority and discre

tion in making the sale are to a certain extent primarily vested in the officer designated in the decree. Unreasonable directions of the solicitor are not obligatory and should not be followed, as if the solicitor should direct the property to be struck off at great sacrifice when but a single bidder attended the sale. Under such circumstances, the officer might well refuse to do as he was directed, and he might be justified in postponing the sale to a future day to prevent the sacrifice of the property. Every such officer has a right to exercise a reasonable discretion to adjourn such a sale, and all that can be required of him is, that he should have proper qualifications, use due diligence in ascertaining the circumstances, and act in good faith, and with an honest intention to perform his duty.

General rule is, that a sheriff is not bound to obey the directions of the attorney of the creditor to make an unreasonable sale of the property of the debtor, if he sees that the time selected, or other attending circumstances, will be likely to produce great sacrifice of the property; but he may in such a case, if he thinks proper, postpone the sale, especially if it appears that the creditor will not sustain any considerable injury by the delay; and no reason is perceived why the same rule may not be safely applied in judicial sales made under the decretal order of a court of chancery.

8. Courts often say that an auctioneer is solely the agent of the seller of the goods until the sale is effected, and that then he becomes also the agent of the purchaser, for certain purposes; but the marshal or master, in carrying out a decretal order, is more than an auctioneer. They have duties to perform for all concerned, and in the performance of those duties they may adjourn the sale for good cause shown. Repeated decisions have established that rule, and in the leading case of *Collier* v. *Whipple,*\* the court went further, and held that such an officer was bound to exercise a reasonable discretion in that matter. Same rule had been pre-

---

\* 13 Wendell, 229.

viously sanctioned in numerous cases,* and was expressly laid down by the chancellor in the case of *Kelley* v. *Israel,†* which is one of the latest cases upon the subject.

But the record shows, in this case, that the bid of the appellant was never accepted, and that the adjournments were made by the direction of the solicitors of the complainants to enable the respondents to pay the mortgage debt and save the mortgaged property from sacrifice. Negotiations to that effect were opened between the parties to the suit on the day the first bid of the appellant was made, and they were completed within two days, so that all concerned knew, or might have known, that a sale had become unnecessary. Subsequent postponement took place to enable the respondents to carry the arrangements into effect. They paid the debt, and the complainants executed a discharge for the same. Justice has been done, and all are satisfied except the appellant, and he has no just ground of complaint.

DECREE AFFIRMED WITH COSTS.

---

* Tinkham *v.* Purdy, 5 Johnson, 345; McDonald *v.* Neilson, 2 Id. 190; Keightly *v.* Birch, 3 Campbell, 321; Leader *v.* Denney, 1 Bosanquet & Puller, 359.

† 11 Paige, 154.